IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JANA LUKER,                     §
                                §
          Plaintiff,            §
                                §
v.                              §        ACTION NO. 4:09-cv-3860
                                §
G.C. SERVICES, LP,              §
                                §
          Defendant.            §
                                §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant's Motion for Partial Summary Judgment on Plaintiff's Claim Regarding Guy Sullivan (Docket Entry No. 48); Defendant's Motion for Partial Summary Judgment on Plaintiff's Actual Damages Claims (Docket Entry No. 50); Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Under 47 U.S.C. § 227(b)(A)(iii) (Docket Entry No. 51); Defendant's Motion for Summary Judgment on Plaintiff's Claims for Statutory and Exemplary Damages Under TDCPA (Docket Entry No. 52); and Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Under the Texas Business and Commerce Code (Docket Entry No. 53).

The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Defendant's Motion for Partial Summary Judgment on

---

[1]   This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Docket Entry No. 19.

Plaintiff's Claim Regarding Guy Sullivan (Docket Entry No. 48) be **GRANTED**; that Defendant's Motion for Partial Summary Judgment on Plaintiff's Actual Damages Claims (Docket Entry No. 50) be **DENIED IN PART**, **GRANTED IN PART**; that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Under 47 U.S.C. § 227(b)(A)(iii) (Docket Entry No. 51) be **GRANTED**; that Defendant's Motion for Summary Judgment on Plaintiff's Claims for Statutory and Exemplary Damages Under TDCPA (Docket Entry No. 52) be **DENIED IN PART**, **GRANTED IN PART**; and that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Under the Texas Business and Commerce Code (Docket Entry No. 53) be **GRANTED**.

## I.   Background

**A.   Procedural History**

This cases arises out of the collection of a debt from Plaintiff by Defendant on behalf of a non-party creditor in the latter half of 2009.[2]  In short, Plaintiff avers that Defendant's collection practices, which included threats to garnish her disability wages and take away her home, exacerbated her existing mental and emotional conditions,[3] causing her "further mental and

---

[2]     See generally Doc. 33, Third Amended Complaint.

[3]     Plaintiff states that she "suffers from major depression recurrent severe without psychosis, panic disorder with agoraphobia, generalized anxiety, social anxiety, severe obsessive-compulsive disorder, and mixed personality disorder." Id. at ¶ 20.

2

emotional pain and anguish."[4]

Plaintiff initiated this action against Defendant on December 1, 2009.[5]  She alleges violations of: the Fair Debt Collection Practices Act ("FDCPA"), 16 U.S.C. §§ 1692e(5), 1692e(10), and 1692g(b); the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. 227(b)(1)(A)(iii); the Texas Debt Collection Practices Act ("TDCPA"), Tex. Fin. Code §§ 392.301(a)(8) and 392.304(a)(19);[6] and the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.41.[7]

## B.   Factual History

Plaintiff has been treated for various psychological problems since 1990.[8]  In 1996, Plaintiff was diagnosed with depression and began receiving Social Security disability benefits.[9]  She has also been diagnosed with "major depression recurrent severe without psychosis, panic disorder with agoraphobia, generalized anxiety, social anxiety, severe obsessive-compulsive disorder, and a mixed-

---

[4]     See id. ¶¶ 22-23.

[5]     Doc. 1, Original Complaint.

[6]     While the complaint gives the statute as "392.304(a)(18)," Plaintiff states that this is typographical error and should be "392.304(a)(19)."  Because the language quoted in the complaint clearly comes from Section 392.304(a)(19), and because Defendant seems not to object to this change, the court accordingly makes the appropriate change throughout this Memorandum.

[7]     Doc. 33, Third Amended Complaint, ¶¶ 24-67.

[8]     Doc. 50-3, Ex. B, Depo. of Plaintiff, p. 63.

[9]     Id. at 56-57.

personality disorder."[10]    Since the mid-1990s, her treating physician Stuart Tieszen, M.D., ("Dr. Tieszen") has treated her in various ways, including prescription drugs, psychotherapy, and shock therapy, but Plaintiff has not responded well to any of these treatments.[11]    In a letter dated May 3, 2010, summarizing Plaintiff's illnesses, Dr. Tieszen stated that her depression was "extremely debilitating;" that it had "never gone into remission;" that she experienced severely low self-esteem; and that she experienced significant problems with focus, concentration, and disorganized thinking, which was particularly easily exacerbated by stress and anxiety.[12]

At an unknown time,[13] Plaintiff opened a consumer credit account with Citibank and eventually owed Citibank $13,688.39 in connection with that account.[14]   Plaintiff failed to make payments on the account after November 2008, and Citibank began calling her

---

[10]    Doc. 50-2, Ex. A, Plaintiff's Medical Records from Dr. Tieszen, p. 4.

[11]    Doc. 50-3, Ex. B, Depo. of Plaintiff, pp. 72-73; see generally Doc. 50-2, Ex. A, Plaintiff's Medical Records from Dr. Tieszen.

[12]    Doc. 50-2, Ex. A, Plaintiff's Medical Records from Dr. Tieszen, pp. 4-5.

[13]    Plaintiff testified that she could not remember when, although it was prior to November 2008.  See Doc. 49-1, Ex. A, Depo. of Plaintiff, pp. 135, 143.

[14]    Id. at 163; Doc. 49-3, Ex. B, Depo. of Grover, pp. 22-23.  Paul Grover held the position of "vice president client management group" with Defendant.  Doc. 49-3, Ex. B, Depo. of Grover, p. 5.  See also Doc. 60-1, Ex. A, Affidavit of Dennis Kurz and Citibank Credit Card Statements (showing the amounts spent on credit and the wide range of businesses from which Plaintiff made purchases).  Plaintiff states that she opened the credit line to help with her daily expenses and to have in case she needed extra money for anything.  Doc. 53-6, Ex. C, Depo. of Plaintiff, pp. 136-37.

in January or February of 2009 to collect on the debt.[15]  Each time

a Citibank representative called, she explained that her $900-per-

month disability income was not enough to allow her to make the

$414.59 monthly payments Citibank was demanding.[16]   Plaintiff

attempted to refinance the balance to a lower interest rate but was

denied because of her "debt to income ratio;" instead, she was

offered a hardship assistance program but was unable to make the

$170-per-month payments under that plan either.[17]

On August 5, 2009, Citibank wrote Plaintiff a letter stating

that she must pay $414.59 on her account by August 21, 2009, to

avoid having the account turned over to a collection agency.[18]

Plaintiff did not pay, and Citibank turned the account over to

Defendant on August 26, 2009.[19]

Plaintiff spoke with an employee of Defendant, Greg Reese

("Reese") within a few days of Defendant's receipt of Plaintiff's

Citibank account.  Reese told Plaintiff that she must either pay

$25 that day or else he would have Citibank garnish her wages.[20]

---

[15]    Doc. 49-1, Ex. A, Depo. of Plaintiff, p. 143.  Plaintiff does not dispute that she was responsible for the charges on the account. Doc. 49-2, Ex. A, Depo. of Plaintiff, p. 194.

[16]    Doc. 50-3, Ex. B, Depo. of Plaintiff, pp. 134, 144-45.

[17]    Id. at 156-59, 163-65.

[18]    Doc. 49-1, Ex. A, Depo. of Plaintiff, pp. 133-34.

[19]    Id. at 135; Doc. 49-3, Ex. B, Depo. of Grover, p. 16.  In payment, Defendant receives a commission from Citibank proportionate to the amount of debt it recovers from the account holder. Doc. 49-3, Ex. B, Depo. of Grover, pp. 126-27.

[20]    Doc. 50-4, Ex. B, Depo. of Plaintiff, pp. 272-77.

When she told him that she had no income because she was on disability, Reese told her that he would have her checking account garnished.[21]  Reese confirmed with her that she was refusing to pay and then told her that he would start the paperwork for Citibank to garnish her checking account.[22]  After the call ended, Plaintiff spent "the next three hours breaking down, crying, sobbing, a nervous wreck, sick, calling everybody in my family scared to death because I thought my wages were fixing to be garnished."[23]

On August 28, 2009, Defendant sent Plaintiff an initial collection letter.[24]  In early September 2009, she saw Dr. Tieszen but made no mention of Defendant or of any emotional or mental issues arising from her interaction with Defendant.[25]  On September 27, 2009, Defendant sent Plaintiff a second collection letter.[26]

On October 12, 2009, another of Defendant's employees, Steve Hill ("Hill"), called Plaintiff to demand full payment of her outstanding debt.[27]  When Plaintiff stated that she could not pay that amount, she and Hill negotiated an agreement to settle the

---

[21]    Id. at 278-80.

[22]    Id. at 280.

[23]    Id. at 281-82.

[24]    Doc. 49-3, Ex. B, Depo. of Grover, pp. 13-14.

[25]    Doc. 50-2, Ex. A, Plaintiff's Medical Records from Dr. Tieszen, p. 9.

[26]    Doc. 49-3, Ex. B, Depo. of Grover, p. 14.

[27]    Id. at 105-06.

account for $6,845, about half of what she owed, to be paid two days from then.[28]

On October 14, 2009,[29] at 8:49 a.m., Defendant faxed Plaintiff a letter confirming the settlement offer.[30]  Later that day, Hill called Plaintiff again and told her that she had forty-eight hours to pay $6,000 or else Citibank would take her to court and take her home.[31]  To pay that amount, she cashed a savings bond, which would have been worth $10,000 at maturity, for $6,612.00.[32]  She called Hill to tell him that she was about $200 short on the amount she owed; he insisted that she find the money.[33]  Hill handed the telephone to another of Defendant's employees, Matt Jones ("Jones"), who, according to Plaintiff, also insisted that she pay the full settlement amount.[34]  Either Hill or Jones threatened to garnish her wages if she did not comply.[35]  Plaintiff testified that she was scared because she did not know what actions Defendant

---

[28]    Doc. 49-2, Ex. A, Depo. of Plaintiff, p. 327; Doc. 49-3, Ex. B, Depo. of Grover, pp. 23-24, 105-06, 119; Doc. 49-4, Ex. C, Depo. of Sullivan, p. 58.

[29]    The parties have not made the precise timeline of events on this day entirely clear to the court.

[30]    Doc. 49-3, Ex. B, Depo. of Grover, p. 14.

[31]    Doc. 50-4, Ex. B, Depo. of Plaintiff, pp. 313-14.

[32]    Id. at 258-60.

[33]    Id. at 328.

[34]    Id. at 328-30.  Defendant's log notes with respect to the call indicate that Plaintiff said she was $233 short and that she was asked how much time she needed to make up the difference; Plaintiff then became upset and started crying.  Doc. 49-3, Ex. B, Depo. of Grover, p. 115.

[35]    See e.g., Doc. 49-4, Ex. C, Depo. of Sullivan, p. 47.

might take to collect the debt.[36]

Plaintiff also called Defendant at some point on October 14 to have her bank draft verified,[37] which Defendant's employee Guy Sullivan ("Sullivan"), an assistant manager, did, without reviewing the details of her account.[38]  At this time, her account was in a "pending settlement" status.[39]  Plaintiff testified that, at the time she called Defendant to authorize the draft, she had already secured funding for the entire amount she owed, with the money from the savings bond having been deposited in her checking account and the remaining $200, representing borrowed funds in the form of a check, having been sent that day via mail to her bank.[40]

On October 15, 2009, at 9:19 a.m., Defendant sent Plaintiff another letter, this one stating when a postdated check would be deposited.[41]

On October 16, 2009, Plaintiff again called Defendant[42] and

---

[36]    Doc. 50-4, Ex. B, Depo. of Plaintiff, p. 333.

[37]    In other words, Plaintiff authorized a check over the phone; she did not send Defendant a physical check.  Doc. 49-3, Ex. B, Depo. of Grover, p. 95.

[38]    Doc. 49-4, Ex. C, Depo. of Sullivan, pp. 13, 25-26.

[39]    Doc. 49-3, Ex. B, Depo. of Grover, p. 95.  The parties have not made clear whether Plaintiff's account status was changed on October 12, 2009, when the agreement was made, or on October 14, 2009, when she verified her check.

[40]    Doc. 49-2, Ex. A, Depo. of Plaintiff, pp. 257-58.

[41]    Doc. 49-4, Ex. B, Depo. of Grover, p. 14.

[42]    Plaintiff recorded this second conversation, which lasted approximately forty-five minutes.  Doc. 49-2, Ex. A, Depo. of Plaintiff, pp. 204-208; Doc. 49-4, Ex. C, Depo. of Sullivan, p. 51.  Plaintiff states that she recorded the call because: "I was already talking to lawyers, and I already knew that they had broken the law.  So if there was anything that was said that could help me in my case, then I would let my lawyers decide whether or not the tapes

spoke with Sullivan to inquire when her pay-off draft would be posted as paid and to see if it could be delayed by a day, because her checking account was short of the amount owed by about two hundred dollars.[43]  Plaintiff had already obtained that amount and had sent the check to her bank, but it had not yet posted.[44] Plaintiff also called "to vent about previous conversations she had with other account representatives," i.e., Hill and Jones, at which time Sullivan reviewed her account.[45]   During the conversation, Sullivan told Plaintiff that, as he understood it, a creditor could not garnish a disability check before it was cashed, but that a creditor could levy a checking account, regardless of the source of the funds in that account, even if those funds were from a deposited disability check.[46]  He also told her that neither of those options would happen to her because her account was "already secured" and she was "in compliance with" her account.[47]

On October 19, 2009, Plaintiff's check was posted and Defendant returned Plaintiff's account to Citibank.[48]  She was sent

---

would be used."  Doc. 49-2, Ex. A, Depo. of Plaintiff, p. 211.

[43]     Doc. 49-2, Ex. A, Depo. of Plaintiff, pp. 208-210.

[44]     Id. at 209.

[45]     Doc. 49-4, Ex. C, Depo. of Sullivan, pp. 25-26, 47-48.

[46]     Id. at 57, 61-63.  The parties agree that his statements were based on his inaccurate understanding of the law.  See Doc. 59, Plaintiff's Response to Defendant's MSJ on Plaintiff's Claim Regarding Sullivan, p. 2 (citing Doc. 49-4, Ex. C, Depo. of Sullivan, p. 55).

[47]     Doc. 49-4, Ex. C, Depo. of Sullivan, pp. 57-58.

[48]     Doc. 49-3, Ex. B, Depo. of Grover, pp. 24-25, 93.

a letter by Defendant acknowledging that a settlement in full had been "reached and paid and sent."[49]  Her check was deposited on October 20, 2009.[50]

In November 2009, she saw Dr. Tieszen but made no mention of Defendant or of any emotional or mental issues arising from her interaction with Defendant.[51]  The first time her medical records show any mental or emotional disturbance in connection with Defendant was on a visit to Dr. Tieszen dated May 27, 2010, approximately six months after the initiation of this lawsuit and more than seven months after the events of this lawsuit occurred.[52] She told him that she was having money troubles and had settled one card.[53]  She said that she could not pay on another card, and that she tried to negotiate with the company but they refused and gave her forty-eight-hour ultimatums to pay the debt.[54]  She told him that she cashed out her grandfather's bond, borrowed money, and paid off what amounts she could.[55]  Dr. Tieszen noted that her anxiety had escalated greatly and that she was essentially

---

[49]   Id. at 14.

[50]   Doc. 49-3, Ex. B, Depo. of Grover, p. 93.

[51]   Doc. 50-2, Ex. A, Plaintiff's Medical Records from Dr. Tieszen, p. 8.

[52]   Id. at 1; Doc. 1, Original Complaint.

[53]   Doc. 50-2, Ex. A, Plaintiff's Medical Records from Dr. Tieszen, p. 1.

[54]   Id.

[55]   Id.

homebound.[56] She reported to him that she would not bathe for days and that she obsessed and ruminated about losing her home and about how to go outside, get groceries, and obtain her medications.[57]

## II.  **Summary Judgment Standard**

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002). The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125,

---

[56]    Id.

[57]    Id.

11

1131 (5th Cir. 1992).

### III.   <u>Analysis</u>

**A.   TCPA, 47 U.S.C. § 227(b)(A)(iii)**

Defendant moves for summary judgment on Plaintiff's claim under the TCPA, 47 U.S.C. § 227(b)(A)(iii).[58]   Plaintiff responds that she had already offered to dismiss this claim against Defendant and affirmatively states in her brief that she does not object to its dismissal.[59]

Accordingly, the court **RECOMMENDS** that Defendant's motion be **GRANTED**.

**B.   Claims Regarding Sullivan Under the FDCPA and the TDCPA**

Defendant moves for summary judgment on Plaintiff's claims regarding Sullivan with respect to the FDCPA, 15 U.S.C. § 1692e(10), and the TDCPA, Tex. Fin. Code § 392.304(a)(19).[60]   In short, Defendant argues that any statements made by Sullivan were not made in an attempt to collect a debt and, therefore, his actions do not bring Defendant within the auspices of the FDCPA or the TDCPA.[61]

---

[58]   Doc. 51, Defendant's MSJ on Plaintiff's TCPA Claim.

[59]   Doc. 57, Plaintiff's Response to Defendant's MSJ on Plaintiff's TCPA Claim.

[60]   Doc. 48, Defendant's MSJ on Plaintiff's Claim Regarding Sullivan. These are the only two claims made with respect to the circumstances surrounding Plaintiff's interaction with Sullivan. <u>See generally</u> Doc. 33, Third Amended Complaint.

[61]   <u>See, e.g.</u>, Doc. 48, Defendant's MSJ on Plaintiff's Claim Regarding Sullivan, ¶ 9.

The FDCPA was enacted:

> to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

15 U.S.C. § 1692k. The FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," including "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. §§ 1692e, 1692e(10). There is no dispute that Plaintiff is a "consumer" under the FDCPA and that Defendant is a "debt collector" under that act. See 15 U.S.C. §§ 1692a(3), (6). A debt collector in violation of the FDCPA is liable for actual damages, additional damages of up to $1,000, and attorneys' fees. See 15 U.S.C. § 1692k.

Section 392.304(a)(19) of the TDCPA provides: "[I]n debt collection or obtaining information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or misleading representation that employs the following practices: . . . (19) using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." A plaintiff who prevails may recover actual damages, attorneys' fees, and at least $100 for each violation of certain provisions. Tex. Fin. Code § 392.403.

Plaintiff testified that, by October 14, 2009, before she called Defendant to authorize the postdated check, she had secured funding for the entire amount of the settlement, with the final $200 having been sent in the mail earlier that day. Her account was by then in a "pending settlement" status. On October 16, 2009, Plaintiff called Defendant and spoke with Sullivan. He made statements to her based on his inaccurate understanding of the law with respect to whether funds received from a Social Security disability check could be garnished after it was deposited into a checking account. Sullivan also told her that her checking account would not be garnished because she was in compliance with her credit account.

Sullivan's interaction with Plaintiff brings Defendant within the broad statutory language of the FDCPA and the TDCPA. The FDCPA only requires that statements be made "in connection with the collection of any debt." 15 U.S.C. §§ 1692e. Plaintiff's call to Defendant was clearly related to the debt collection proceedings that had been initiated by Citibank and by Defendant. Similarly, the TDCPA only requires that the statements be made "in debt collection." Tex. Fin. Code § 392.304. Sullivan's statements therefore clearly fall under the umbrellas of the FDCPA and the TDCPA.

To violate Section 1692e(10), Defendant must have used the misrepresentation for the purpose of collecting or attempting to

14

collect on any debt or for the purpose of obtaining information concerning Plaintiff. Similarly, to violate Section 392.304(a)(19), Defendant must have used the misrepresentation for the purpose of collecting a debt or for the purpose of obtaining information concerning Plaintiff. The summary judgment evidence shows that: (1) Plaintiff contacted Defendant; (2) Plaintiff had secured funding for the entire settlement amount; (3) Plaintiff had authorized a check to Defendant; (4) and Sullivan told Plaintiff that nothing he stated, including the misrepresentation that her disability check could be garnished after deposited into a checking account, would happen to her because she was in full compliance with her account. On this evidence, it is clear that none of Sullivan's statements were made to collect on a debt, to attempt to collect on a debt, or to obtain information about Plaintiff, and Plaintiff has provided no evidence creating a fact issue otherwise. Thus, Sullivan's statements do not violate either Section 1692e(10) of the FDCPA or Section 392.304(a)(19) or the TDCPA.

Accordingly, the court **RECOMMENDS** that Defendant's motion for partial summary judgment be **GRANTED** and that Plaintiff's claims with respect to Sullivan be **DISMISSED**.

## C.   DTPA Claims

Plaintiff asserts that Defendant violated Section 1741 of the DTPA by making material representations it knew or should have known to be false. She brings her DTPA claim pursuant to a tie-in

15

provision included in the TDCPA. <u>See</u> Tex. Bus. & Com. Code §§
17.43, 17.50(h); Tex. Fin. Code § 392.404(a). Defendant moves for
summary judgment on her DTPA claim by arguing that Plaintiff lacks
standing to bring a claim thereunder because she is not a
"consumer" as the Act requires. <u>See</u> Tex. Bus. & Com. Code §
17.50(a) ("A consumer may maintain an action . . . ."). Plaintiff
responds that she was a "consumer" under the DTPA because she
acquired her credit with Citibank for the primary purpose of
obtaining goods and services. <u>See</u> Tex. Bus. & Com. Code § 17.45(4)
("'Consumer' means an individual . . . who seeks or acquires by
purchase or lease, any goods or services . . . .").

In <u>Cushman v. GC Services, L.P.</u>, the Fifth Circuit held that
a DTPA claimant using the TDCPA tie-in statute must prove consumer
status to have standing. 397 Fed. App'x 24, 28 (5th Cir. Sept. 30,
2010)(unpublished). There, the defendant collection agency
contacted the plaintiff debtor to collect credit card debts owed to
American Express. <u>Id.</u> at 26. After holding that the plaintiff was
required to prove consumer status to have standing, the court noted
that, based on the facts of the case, any argument that the
plaintiff qualified as a consumer under the DTPA lacked merit. <u>Id.</u>
at 28.

To establish "consumer" status under the DTPA,[62] a plaintiff

---

[62] The court notes that the definition of "consumer" under the TDCPA is
different from the definition of "consumer" under the DTPA; thus Plaintiff may
have standing under one statute as a "consumer" but not under the other. <u>Compare</u>
Tex. Bus. & Com. Code § 17.45(4) <u>with</u> Tex. Fin. Code § 392.001 (stating that

must establish two elements: "(1) a person must have sought or acquired, goods or services, by purchase or lease, and (2) the goods or services, purchased or leased, must form the basis of the complaint." <u>Burleson State Bank v. Plunkett</u>, 27 S.W.3d 605, 614 (Tex. App.—Waco 2000); <u>see also</u> Tex. Bus. & Com. Code § 17.45(4). At the trial court level in <u>Cushman</u>, the court provided a thorough and persuasive analysis of whether a line of credit, specifically an American Express credit card, could provide a basis for consumer status under the DTPA. See <u>Cushman v. GC Services, LP</u>, 657 F. Supp. 2d 834, 842-44 (S.D. Tex. 2009). The court found that obtaining a line of credit was an attempt to acquire money, which was not a "good" as defined by the DTPA, and that borrowed money only provided consumer status under the DTPA when that money was obtained to acquire a specific good, such as a house. <u>Id.</u> at 844 (citing <u>Flenniken v. Longview Bank & Trust Co.</u>, 661 S.W.2d 705 (Tex. 1983)(holding that a borrower seeking financing for a house qualified as a "consumer" under the DTPA); <u>Knight v. Int'l Harvester Credit Corp.</u>, 627 S.W.2d 382 (Tex. 1982)(finding that a bank customer was a "consumer" because he sought financing to purchase a dump truck); <u>Riverside Nat'l Bank v. Lewis</u>, 603 S.W.2d 169, 174 (Tex. 1980)(holding that money is not a "good" and that "services" do not include an extension of credit)).

---

"consumer" means "an individual who has a consumer debt; "consumer debt" means an obligation "primarily for personal, family, or household purposes and arising from a transaction").

Here, Plaintiff attempts to show that she obtained the money to purchase goods and services, and she provides her credit card statements as evidence thereof.[63]  Plaintiff testified that she opened the credit line to help with her daily expenses and to have in case she needed extra money for anything.[64]

Plaintiff's argument is without merit.  A generalized showing that goods or services were purchased with a line of credit is not enough to show consumer status under the DTPA.  Texas case law is clear that the credit must be obtained for the purpose of obtaining a particular item, such as a house or a dump truck.  In Cushman, as here, the plaintiff presented no evidence that she applied for her credit card to make any specific purchase; she had no large purchase planned when she obtained the line of credit; and the card was used for general purposes.  See Cushman, 657 F. Supp. 2d at 844.  Thus, Plaintiff has not shown that she is a person who sought or acquired goods or services when she obtained her credit from Citibank.  In addition, Plaintiff has presented no evidence that any of the items that she bought form the basis of her complaint; this lawsuit is about the payment of credit card debt, not about any good or service she obtained with that line of credit.

Therefore, the court finds that Plaintiff does not meet the

---

[63]    See Doc. 60-1, Ex. A, Affidavit of Dennis Kurz and Citibank Credit Card Statements (showing the amounts spent on credit and the wide range of businesses from which Plaintiff made purchases).

[64]    Doc. 53-6, Ex. C, Depo. of Plaintiff, pp. 136-37.

"consumer" status requirement to have standing to bring a claim under the DTPA.  Accordingly, the court **RECOMMENDS** that Plaintiff's DTPA claims be **DISMISSED** and that Defendant's partial motion for summary judgment on this issue be **GRANTED**.

**D.    Statutory and Exemplary Damages Under the TDCPA**

Defendant did not move for summary judgment on the TDCPA claims arising from the statements of its employees Reese and Hill. Defendant argues that certain of Plaintiff's damages related to those claims are not allowed as a matter of law.  The court agrees, in part.

**1.    Statutory Damages**

Defendant moves to dismiss Plaintiff's claims for statutory damages under the TDCPA.  <u>See</u> Tex. Fin. Code § 392.403(e).  The TDCPA permits a remedy of "additional damages of at least $100 for each violation" of Texas Finance Code §§ 392.101, 392.202, or 392.301(a)(3).  <u>Id.</u>  Plaintiff acknowledges that she has not brought a claim under any of those three provisions and therefore concedes that she may not obtain statutory damages under Section 392.403(e).[65]

Accordingly, the court **RECOMMENDS** that Defendant's motion on statutory damages be **GRANTED** and that any claim for statutory damages pursuant to Texas Finance Code § 392.403(e) be **DISMISSED**.

---

[65]    Plaintiff states that she never even claimed such damages.

### 2.   Exemplary Damages

Civil remedies explicitly permitted under the TDCPA involve injunctive relief, actual damages, attorney's fees, and certain statutory damages.  *See* Tex. Fin. Code § 392.403.  However, the TDCPA "does not affect or alter a remedy at law or in equity otherwise available to a debtor . . . ."  Tex. Fin. Code § 392.404(b).  In other words, the TDCPA expressly preserves all other remedies that may be available to a plaintiff.  Thus, even though the Act is silent with respect to punitive damages, they are available to a plaintiff pursuant to Texas Finance Code § 392.404(b).  *See e.g.*, *Waterfield Mortg. Co. v. Rodriguez*, 929 S.W.2d 641, 645 (Tex. App.—San Antonio 1996, no writ)(making the same statutory interpretation on similar wording with respect to the predecessor of the TDCPA, the Texas Debt Collection Statute).

Under Texas law, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." Tex. Civ. Prac. & Rem. Code § 41.003(a).  Thus, Plaintiff must here allege and prove fraud, malice, or gross negligence on the part of Defendant for alleged violations of the TDCPA before exemplary damages may be awarded.  Here, Plaintiff's complaint alleges violation of two provisions of the TDCPA: Tex. Fin. Code §§ 392.301(a)(8) and 392.304(a)(19).  Under the former, Plaintiff

20

makes no allegations of fraud, malice, or gross negligence.[66]  Under
the latter provision, Plaintiff does not allege malice or gross
negligence, but she does allege fraud and supports it with summary
judgment evidence by stating that Reese threatened to start the
paperwork that would lead to her losing her home when he did not
intend to do so.[67]

Thus, the court finds that Plaintiff may seek exemplary
damages in this case, but only with respect to the purported
violation of Texas Finance Code § 392.304(a)(19) by Defendant's
employee Reese.  Accordingly, the court **RECOMMENDS** that Defendant's
motion for partial summary judgment on the issue of exemplary
damages be **DENIED IN PART**, **GRANTED IN PART**.

**E.   Actual Damages Under FDCPA and TDCPA**

**1.   Economic Damages**

Plaintiff claims economic damages because she cashed out a
bond, purportedly worth $10,000 at maturity, for only $6,612 so she
could pay the agreed-upon settlement amount.  She claims she was
damaged because the full face value of the bond was never reached.
Although Plaintiff does not explicitly say so, she appears to be
arguing that her economic damage is the amount of the bond at
maturity minus the cash amount she received from cashing it early,

---

[66]    See Doc. 33, Third Amended Complaint, ¶¶ 49-53.

[67]    See Doc. 33, Third Amended Complaint, ¶¶ 54-58; Doc. 50-4, Ex. B,
Depo. of Plaintiff, pp. 278-80. Her allegations against Hill do not state a claim
of fraud, and the court has already recommended that the claims against Sullivan
be dismissed.

i.e., $3,388.

The court is unpersuaded that this amount is an economic damage to Plaintiff in this case. As Plaintiff states, "the injury sustained by Plaintiff that resulted in actual damages . . . is a separate and distinct matter from the settlement agreement itself."[68]   There is no dispute that Plaintiff owed Citibank $13,688.39. There is no dispute that Plaintiff agreed to settle her full debt by paying only $6,845 to Defendant. To uphold her end of the agreement, she had to cash out a bond before it reached maturity. There is no question that Plaintiff received the benefit of the bargain she made with Defendant; her account was marked "paid in full" after the money was received. Any interest lost on the non-mature bond is simply not an economic damage caused by Defendant's actions. Furthermore, the court finds evidence of no other types of economic damages among the summary judgment evidence, and Plaintiff does not argue for any in her response to Defendant's motion.

Thus, the court finds that Plaintiff has not provided evidence of actual economic damages. Accordingly, the court **RECOMMENDS** that Defendant's motion be **GRANTED** insofar as it seeks to dismiss on the basis of no economic damages.

**2.   Noneconomic Damages**

---

[68]   Doc. 61, Plaintiff's Response to Defendant's MSJ on Plaintiff's Actual Damages, p. 22.

Plaintiff also claims that her existing mental and emotional conditions were exacerbated by Defendant's actions, thus causing her further mental and emotional pain and anguish. Defendant argues that Plaintiff has put forth no evidence that her existing mental health issues were exacerbated by its actions.

A plaintiff may recover actual damages for mental anguish under both the FDCPA and the TDCPA. 15 U.S.C. § 1692k(a)(1); Tex. Fin. Code § 392.403(a). To recover mental anguish damages, the plaintiff must introduce direct evidence of the nature, duration, and severity of the mental anguish, thereby establishing a substantial disruption in the plaintiff's daily routine. Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 54 (Tex. 1997).

Plaintiff has testified that, immediately after her conversation with Reese, she spent three hours "breaking down, crying, sobbing, a nervous wreck, sick, calling everybody in my family scared to death because I thought my wages were fixing to be garnished."[69]  She also testified that, during and after her conversation with Hill, that she was scared because she did not know what other actions Defendant might take to collect the debt.

She also saw her treating physician Dr. Tieszen on May 27, 2010, more than seven months after the events of this lawsuit occurred. She discussed with him her money troubles and her interactions with Defendant in settling her Citibank credit card.

---

[69]     Doc. 50-4, Ex. B, Depo. of Plaintiff, pp. 281-82.

She reported that she would not bathe for days and that she obsessed and ruminated about losing her home and about how to go outside, get groceries, and obtain her medications. Dr. Tieszen noted that her anxiety had escalated greatly and that she was essentially homebound.

The court must consider the evidence in a light most favorable to the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Taking the evidence in a light most favorable to Plaintiff, then, the court finds that she has presented evidence of the nature and severity of her mental anguish with a duration of up to eight months. Plaintiff has thus raised a fact issue with respect to whether her stated mental and emotional pain and anguish were a result of Defendant's actions or, as Defendant avers, were a result of existing mental health issues.

Thus, the court **RECOMMENDS** that Defendant's motion for summary judgment on the issue of noneconomic damages be **DENIED.**

Accordingly, the court **RECOMMENDS** that Defendant's motion for partial summary judgment on the issue of actual damages be **DENIED IN PART, GRANTED IN PART.**

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claim Regarding Guy Sullivan (Docket Entry No. 48) be **GRANTED**; that Defendant's Motion for Partial Summary Judgment on Plaintiff's Actual Damages

24

Claims (Docket Entry No. 50) be **DENIED IN PART**, **GRANTED IN PART**; that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Under 47 U.S.C. § 227(b)(A)(iii) (Docket Entry No. 51) be **GRANTED**; that Defendant's Motion for Summary Judgment on Plaintiff's Claims for Statutory and Exemplary Damages Under TDCPA (Docket Entry No. 52) be **DENIED IN PART**, **GRANTED IN PART**; and that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims Under the Texas Business and Commerce Code (Docket Entry No. 53) be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. The original of any written objections shall be filed with the United States District Clerk electronically.

**SIGNED** in Houston, Texas, this 23ʳᵈ day of March, 2011.

Nancy K. Johnson
United States Magistrate Judge

25